Case No. 22-5153. Amara Emuwa et al. Appellants v. United States Department of Homeland Security. Mr. Cleveland for the appellants. Mr. Pfaffenroth for the appellate. Mr. Cleveland, good morning. Good morning. As we approach this case, two things are important. Harm. Trial by ambush. Asylum applicant seeks asylum and must show harm. Consider the case of Mr. Fon, F-O-N, from Cameroon. He was beaten, stabbed, three-inch scarred. They ransacked his house. He had to go into hiding. He lost his job. A friend at DHS said, not enough harm. Trial by ambush. DHS says, that's okay. Of course, they mean, we can do trial by ambush, but not you. It is legal for DHS to ambush an asylum applicant in court with the entire assessment. That is unfair. And, they do not claim to suffer harm when they introduce the entire assessment in court. When they do that in immigration court, they're revealing it to the applicant, his lawyer, the immigration judge, and whoever else is sitting in the courtroom. They do not claim harm at that time. Notice of intent to deny. I'm holding one in my hand that you have from the Boston Asylum Office. Do you know how often they actually use these documents in a hearing? Or disclose them in a hearing? Not very often. It happened to me in March of 2016. I don't know statistics. They claim the right to do it. If it's not very often, then we can't draw much of an inference undercutting their theory of harm. They do it once in a blue moon. Well, it undermines their claim of harm. The assessment is top secret and release causes harm. The fact that they release it voluntarily is evidence that it's not causing harm. I agree. The more they release it, the more evidence there is of lack of harm. Their claim of harm is that this is an internal document. It's deliberative. And if the writers of these documents know that it's going to be disclosed and made public, that will chill their ability to be frank and candid in creating the document. And it seems to me that the fact that every now and then it gets released in a hearing would not be sufficient to chill it. But if it were released as a matter of course in FOIA requests, that would chill their ability to be frank and candid. Well, they do say that. Which is a mere repetition of generic reason behind the deliberative process privilege. There is, it's their burden to show harm. The more they release it, the less harm that there is. There is no expectation of privacy of asylum officers. Asylum officers are instructed that many people shall read the assessments. The applicant, the lawyer, the immigration judge, the FBI, contractors, Department of State, members of Congress. If APM says somebody makes a FOIA request for the assessment, it may be released. Anybody who reads that will think, oh, assessments are not top secret. These documents are covered by the deliberative process privilege. We've already held that. It's obviously true. And they are recommendations from a subordinate to a superior. Which Machado and Aptu both said are at the core of the deliberative process privilege built into Exemption 5. And the fidevit here checks the boxes that Machado says you have to check. It talks about the specific documents at issue. It says that their release would not, could chill candid discussions. Why is this case just not controlled by Machado? The declaration in our case by Ms. Munita does not discuss the specific information. The declaration in Machado is written by a person inside the OIP. You've been there for 10 years. And she has 41 paragraphs. She describes things with specificity. Could I ask you about this, counsel, because it seems to me you've taken the position that the Munita declaration does not address the specific documents at issue. But it seems to do so. Paragraph 12, it talks about the withheld portions of the four assessments at issue in this case. Chapter 13, I'm sorry, paragraph 13 says in each case the withheld information contains certain information. Chapter, paragraph 14, it says revealing the specific deliberations from the assessments in this case would interfere with the ability. It seems to actually address the assessments at issue in this case. There's generic language. You could use that declaration for all assessments. We don't, what, there's four assessments in this case with four different people. One lady's domestic violence from Nigeria. Another lady's fleeing the Mongols, fleeing communist oppression. There's no evidence that Ms. Munita knows any of that. What is it inside these assessments that is so top secret that it can't be revealed? It doesn't tell us. It's the fill-in-the-blanks declaration. Someone told her, oh, asylum officers wrote a report. And then she says, oh, the contents of the report contain information. At least that information will chill them. Consider the Army Corps of Engineers and electric power lines and the environment. Somebody writes a report and says this report contains opinions of the officers about electric power lines and the impact on the environment. If we reveal those things, it will chill them. I could write the declaration for this agency. This is insufficient. You can't just have boilerplate. Could you address paragraph 15? Because that is not boilerplate. That's the paragraph that talks about if you provide this information, bad actors could take this information and tailor asylum applications in a favorable but fraudulent manner. That doesn't seem to be applicable to all different types of deliberative processes. Well, I agree with that. It does. However, that statement itself is based on what? Take paragraph 14, one paragraph before. Revealing the specific pre-decisional deliberations withheld from the assessments in this case would interfere with USCIS' ability to make sound judgments, et cetera. In this case, it makes it look like she read the assessments. That's boilerplate. What is it in this case that is special? We have four different assessments. You should consider the age, content, and character of each one. Otherwise... What we've held, it can be done on a categorical basis. We have not held that there's any requirement to review each document. Well, there is language in many cases. We shall review each document. In the case of Church of Scientology, the CIA had 25 documents, and the court said, we approve of the declarant who said they discussed each document paragraph by paragraph. I think that in this case, especially since we have errors in the assessment and we have the avoidance of other information, other contrary information, notice of intent denied are revealed every day. I think that's a very important part of the case. The content of a notice of intent denied is the same as the content of an assessment. But the courts have held that just because you reveal it in one instance doesn't mean you have to do it in others. Right, you don't have to, but it undermines their claim of harm. They always suffer harm if information from the assessment is revealed. That information is the same as in the notice of intent denied. That's a different kind of document, right? That is designed to be tendered to the alien. It's a report about the alien's application. But it's not deliberative. It's not an internal document. It's something that's created in order to give notice to the alien. It's an opinion written by the officer about the applicant. I say that the noise are exactly the same as assessment. You don't have to take my word for it, because noise are in the record, and assessments are in the record. But they're not identical in the way that's important in this case, which is, would it chill the deliberative process? If twin brothers come to America, and then they both have suffered harm in the old country, and one brother is out of status at the time of his interview, then the officer writes a report. The officer writes a report about both brothers. The report is exactly the same. If one brother happens to be in status, like he's a student, he gets the report. But your hypothetical assumes that the officer is going to write the same thing in a deliberative document as one that it knows will be provided to the alien. And I don't think that you can make that assumption. Well, the officer does know that in many circumstances, the assessments referred shall be revealed. The noise shall always be revealed. The content is the same. I think that's important. Also, sources. Sources are important. What sources are asylum officers using? What if they're using bad sources? The public should know that. In the case of the First Circuit, the asylum office used a criminal database, and the court said that's unreliable. Another judge cited Wikipedia. That's unreliable. What are our asylum officers citing as sources in their assessments? The public has the right to know. And AAPM instructs officers, you must include at least two different assessments, two different sources in some circumstances when you write your assessments. Are the officers following their rules or not? That is the beautiful purpose of FOIA, that you'll find out if the officers are doing what they're supposed to be doing. Another consideration is, the agency says we suffer harm, we suffer harm. Can I ask you a question about sources? Is there, like, a section in this report that lists the sources, or are the sources kind of sprinkled throughout the document? They're sprinkled throughout the document, just like an additional opinion. This seems very laborious. Are you saying that in each case, the agency is required to go through and figure that out and reveal sources? And you're not distinguishing between fact-specific sources, like witness testimony and documents, versus more general sources? Well, one source I'm interested in is, like, from the Danish Immigration Service. I had never heard of that, so I read it and was just annoyed. Well, if that's the source the asylum office likes, then that's good for the private bar. They can cite that back to the asylum office. Doesn't that support their point that that will cause the private bar to tailor their applications to sometimes fraudulently address the sources that they know the agency relies on? Well, but citing a source, there's nothing fraudulent about that. It's good to cite a source that the tribunal likes, it seems to me. But I think the argument is, we don't want to reveal everything, because then some people who might not be scrupulous could look at our sources and tailor their applications fraudulently. Yes, but that is true of district court opinions. District courts write opinions, and they cite their sources. Someone else could read that and say, oh, like the guy that— Sure. The court that has big boobs. So that is a fear we have always. However, the countervailing proposition is we want transparency in government. Why shouldn't they reveal their sources? The district court's final decision is made public and is judged on appeal or in the court of public opinion by whatever the judge chooses to put in the opinion. That doesn't mean that the judge's first draft or the law clerk's bench memo to the judge saying speaking more candidly about the legal reasoning isn't deliberative, shouldn't be protected. That's true. However, assessments written by the asylum officer is what is used in immigration court to get them deported. Only if they choose to introduce that document, which they usually don't. That's true. All of this is just about the executive's deliberation on whether or not to oppose asylum. And it eventually leads to an adjudication in immigration court, trial de novo, you can put in whatever evidence you want, and the government has to put in sufficient evidence to get the alien removed if that's what they want to do. Well, that's true. But Congress said that agencies were overusing the deliberative process privilege, therefore to hide it, to not reveal it, they must show harm. What is the harm? They've not explained that. Consider the history of DHS. In 1990, the regulations said you shall disclose sources, you must give them to the applicant. No claim of harm from 1990 to 1995. Then they changed the policy without saying they suffered harm. Then from 1998 to 2005, they released all of the assessments. No claim of harm during that time period. How do you know that there was no harm? Maybe that's why they changed the policy. There's no evidence in the record. It's their burden to show them. And more importantly, May of 2022, now for certain applicants, without even having the regulations, without having to make even a FOIA request, the officer shall give the decision, the entire decision to the applicant. And also, all non-classified information considered by the officer shall be disclosed. DHS voluntarily adopted that regulation saying, we're going to give you information that's not even in the decision. We're going to give you information considered by the officer and it shall be disclosed. The fact that they did that is evidence that they themselves know they don't suffer harm for giving this information. They voluntarily give information that shows they don't suffer harm. Thank you. Judge Giles, anything else? Just a question about the other issues in the case, like segregation. You know, whether they should reasonably segregate the sources. Should we even reach those issues? Yes, we should. By the way, there's errors in the lower court decision. At 287, the judge wrongly repeats the Solis stuff, and at 387, the judge refers to the district asylum law. There are errors in the lower court decision. Munita does not mention sources in her opinion. But were those issues raised before the district court, is what I'm getting at, about whether we should reach them. Yes, we at all times argued sources should be revealed. Sources should be revealed. But they've never talked about it directly. Munita does not mention them in her declaration. That's evidence to me it's not even considered. I would suggest under the fatality circumstances, the lack of personal knowledge of Munita and anyone else she talked to, and the errors in it, the history of the agency, look at it in totality. The agency did not meet their burden of proof to show harm. I would suggest the lower court should be reversed. Thank you, counsel. We'll give you some rebuttal time. And we'll hear from the government now. Good morning. Mr. Pfaffenroth? Yes. Mr. Pfaffenroth. May it please the court, I'm Dr. Pfaffenroth for the Department of Homeland Security. My friend makes it sound like these proceedings, where in front of the asylum officer are the end of the process, but as Judge Cassis correctly noted, there's a trial de novo in front of an immigration judge that follows from this. Furthermore, as my friend acknowledged, these assessments to refer are only in the unusual case ever introduced in an immigration court proceeding. They're not part of the record. Do you have any order of magnitude estimate, one case in ten? I've asked, and I've been told it's very rare, but they don't quantify it. Okay. And furthermore, my friend, to his credit, this area is a passionate place, and he's been looking for assessments to refer wherever he can find them. And this record in this case, including in the appendix, includes a handful. Those are the handful of which I am aware. Those are the handful of which my agency colleagues have told me they are aware, that are in the public record. There are hundreds, if not thousands, right? It's not quantified directly. But these are very unusual. The fact that a handful has come out as an addendum to a Ninth Circuit decision or an assessment in one specific case for a specific reason does not mean that the public at large can access a large body of evidence such that one might be able to figure out what needs to be said in front of an asylum officer in order to successfully persuade the asylum officer. We want the asylum officer to bring to each proceeding an open mind, to listen to the evidence, to give the applicant a fair hearing, and to make the best recommendation to the asylum officer's supervisor that that person can. And then the asylum supervisor makes the decision. But that's, as I said, not the end of the road. Then it goes to immigration court. And it's trial de novo. Typically, if these assessments to refer are introduced in immigration court at all, it's only as impeachment evidence. In which case, under policy and the law, the asylum applicant, as well as counsel, have the opportunity to review the evidence and to say, well, that's not really contradictory of what they've said today in front of the immigration court. But these are the main point is that as yes. But go back to the arguments presented by the other side about this could be just kind of a checkoff affidavit. And then all you need to do is add the words in this case. And then that makes it somehow more specific to this case to get you beyond the reporter's comments case. Your Honor, there are limited things one can say in an affidavit without showing what's really going on behind the scenes. This court has recognized that, for instance, in the Glomar context. Furthermore, in attorney-client privilege, the facts that are essential to the attorney's advice to the client, those are privileged under this court's jurisprudence. So the current practice and the established practice that the Homeland Security Department, USCIS, has stated it is holding to, as noted by this court in Abdu, that it is releasing, pursuant to FOIA requests, the factual part of an assessment to refer. What it is not releasing are the asylum officer's assessments. And that's for good reason. Because we want to respect the candid advice, protect the ability of the supervisor and the asylum officer to interact and make the best decision for both the applicant and the United States. On the evidence presented to the asylum officer, does this applicant establish that that person is entitled to asylum? Or, to the contrary, is this one of the many instances where people have applied for asylum and it's just not well justified? In which case, we'll let the immigration judge make the filing. Can you speak briefly about the three other kinds of documents that your friend mentioned? Sure. I mean, on the one hand, they are just different. They're done for a different purpose. They're done in order to hand something to an alien to start a process. So I get that. But they do involve asylum officers assessing the strength of the case and jotting down their notes in some written formal way. And that material is routinely handed over and doesn't seem to have put the Republic in jeopardy. I understand. They're just different. If I were a law clerk writing a bench memo for Your Honor and I expected it only to go to Your Honor, I would be as candid in my analysis as I could. If I were writing a bench memo that was going to go to you, as well as to The Washington Post, it would read very differently. That, luckily, is not the world in which we live. Are there other channels in the contexts where a notice of intent to deny, notice of intent to terminate, record of determination, in the context where those documents are generated, are there other documents that are deliberative where the officers are fully candid in the way that my law clerks would be? I have to assume yes, but I'm not an immigration officer and I don't live in that world on a day-to-day basis. Can I ask your friend about whether we need to reach certain issues, just based on whether or not those were actually presented to the district court? I just wanted to know how far we should be going in this opinion. Which issues do you have in mind? Segregability was one of them. Well, segregability was originally addressed in the initial ruling, which was before the initial appeal, and I don't believe that— And the reason I'm saying that is because the remand said, focus on the foreseeable harm. Right. Okay. And I think, furthermore, under precedent, I think if an appellant raises certain issues on appeal and doesn't really dwell on others, or just sort of in the footnotes, for lack of a better word, they're not properly presented. I don't think there's really a meaningful dispute at this stage of this appeal about segregability. He addresses sources, which, as I've already noted, are an integral part of the analysis, determining whether or not the requisite showing has been made. And in that sense, I don't think that you— You couldn't segregate out any given source without showing the underlying reason why that source is relevant, or at least giving a pretty darn good reason. I think the reference in our brief to the mosaic is applicable, right? If you let out a sufficient body of records, whether it's about FBI investigatory practices or what goes into a successful initial appearance in front of an asylum officer, there are many people who will gather all the evidence they possibly can in order to try to understand that process, in order to achieve the outcome they see. But I don't believe the court needs to take a deep dive on segregability. Make sure there's nothing else I wanted to mention. Oh, my friend mentioned a new regulation. I will not get into the weeds of that. I will simply say that that is for a very different context in which assessments to refer, to my understanding, are not even compared. Those are for individuals who have just crossed the border and there is a special procedure that has been developed for that. Sorry, which one is that? It's in a footnote. It's not one of the three I mentioned. No, it's not. Our response to it was simply it wasn't argued in the district court. And obviously, the regulation to what this matter was on appeal, or around when this matter was on appeal, the point is, it's just, and I don't think that the court really has the record in this case, nor would it be prudent to dive into that. I printed it out because I didn't look at the page count, and it was too much to say. So, anyway, or at least the federal district courts. So, if the court has nothing further for me, I'd ask that the decision be made. Sorry. Okay, thank you. Thank you. When someone comes to America seeking asylum, they say, I suffered harm in the old country, I want asylum. And whoever they're talking to, asylum applicants talk in different contexts, but it's the same thing. I suffered harm, I want asylum. Under many circumstances, the United States will give them the decision of the officer. And only for this assessment to refer, they hold that one back. And ironically, that's the one, they hold it back, but then they can later use it against them in court, and to ambush them. OIP issued guidance in March 2023. They say, when the aspect of harm is unclear, then the agency should consult an expert. And that's what they should have done in this case. Ms. Muneeta joined the, got her job a few months before. She wrote her declaration. She doesn't know anything about the asylum division. She was an immigration officer before she got this particular job. She's been working in this field for many years. Doing other things, not asylum. Yes. There's no, she doesn't have any knowledge whatsoever about asylum. This, what is the harm concerning asylum officer assessments? That calls for an expert opinion. OIP makes a suggestion that the agency should have done that. By the way, she's the chief FOIA officer of USCIS regional office. And she was an immigration services officer. Don't they deal with asylum? No. They don't? No. She doesn't know anything about asylum. She doesn't claim to, and she doesn't think she ever talked to anybody with personality. What do immigration services officers do? Family, employment. Asylum is an asylum division. All they do is asylum, and the rest of immigration. And what are their titles in the asylum division? What are they called? Are they called asylum officers? In the asylum division, they're called asylum officers. In the other division, they're called, I don't know what they're called. They don't do asylum. I would suggest that it would have been very easy for the agency, in this case, to get a declaration from the asylum division, and problems would be solved. Do the field offices solicit asylum cases? Because she was a field office director. There are now 11 asylum offices in the country. There's about 20 field offices. They're different. Asylum is its own division. It is very separate. Ms. Munez's declaration has no personal knowledge. It contains errors, and she did not consider the age, content, and character of the assessments before her. I would suggest her declaration is insufficient. Thank you. The case is submitted.
judges: Katsas, Childs, Pan